Thank you very much. We are ready for argument in our last case. Mr. Slusser, thank you. May it please the court. Scott Slusser on behalf of the North Carolina Department of Transportation and Secretary Tennyson. This case is moved as a result of actions that happened after the District Court's opinion. We ask the court to vacate the District Court's decision and remand with instructions to dismiss without prejudice. If funding were to suddenly materialize, what would be the source of a requirement that you prepare a new environmental impact statement in order to proceed? The requirement would be that there would be, have to look at whether or not there was substantially new information. Since the old EIS, what I'm asking is what would be the source of any requirement that you go back and revisit the existing EIS? As I understand it, you would only be required to look at what happened in the interim. Is that correct? Under a re-evaluation, there would be. That would be the standard. And currently, if $900 million appeared, the agencies would have to do a re-evaluation regardless of what happened here today. Correct. But what would require you to, what would happen to the existent environmental impact statement? The one that's sitting out there now. Right. Under a re-evaluation, they would look and see if there's new information. Also, the agencies would have to determine whether or not there needed to be a supplemental EIS based on whether there's a change in the project, new information and so forth. It seems to me that your answer to my question is nothing. That's what I'm trying to get to. It really isn't a trick question. I'm just trying to find out what would be the status of the environmental impact statement that exists. You would look at whether things have changed since that time, right? Correct. But would it not be the starting point is really my question. It could be. It's in the discretion of the agency. Well, they have to look at whether or not there's substantial new information. Is the methodology in the EIS still valid? Is there new information because the MPO updates their socioeconomic data continuously? It's a continuous process. They have to update it every five years. And so there's a new set of socioeconomic data that exists right now that was not in the EIS. So they would have to look at that new information. If we declared the case moved but refused to vacate the district court's decision, how would that impact this process? I mean, you've got a district court decision that says that what you did was invalid. Correct. It would seem to me you'd have to do something to correct that. Right. I guess the project would have to come back to life for the agencies to even consider looking at a new NEPA process. So the MPO would have to put it back in their plan. Money would have to be found. It would have to do all those things, which I think is very highly unlikely at this stage. Assuming all of those things happen, the agencies would have to determine whether or not they do a supplemental EIS, whether they do an entirely new NEPA document. And that's something that agencies always have to consider when going back and looking at existing EISs. I guess what we're concerned about and your opponents are concerned about is that this project will somehow evade judicial review if we move the case and send it back. What's your response to that? The project is deauthorized. There is no federal action anymore. It's no longer in the transportation plan, so it is not a federal action. The record of decision is a final agency decision of a federal action. This is not a federal action anymore. So the rod is really a nullity. There is nothing for a decision to be made on because there is no authority for this project to move forward. So I understand the concern, but I think the practical effect of what is going on confirms that this project is defunct. It's no longer moving forward. So there is no concern in reality that if the rod is vacated. And we would agree, the DOT would agree, if for some reason vacature revived the rod, that the rod should be rescinded at that point. We agree with that. That ultimately is a decision of the Federal Highways Administration. But, again, the rod would be a nullity. There is no project to move forward with. But what reason is there to vacate the district court's decision in this case when the abandonment of the project was not happenstance under the jurisprudence? I mean, it's pretty clear, it seems to me, under the case law that North Carolina played a very pivotal role in terms of funding and decisions made in terms of the multiyear windows and decisions to not build that in the absence of happenstance, what is the basis for us vacating the district court's decision? I would argue this certainly is a case of happenstance. The North Carolina Department of Transportation did not make the laws that took away the funding. They didn't make the news. So you're saying you're totally disassociated from the other acts of North Carolina state government? As far as happenstance. We didn't have anything to do with that? Isn't the state the actor in this case, whether it's through its agency, the Department of Transportation, or through its legislature? I would argue that the actions of the North Carolina legislature shouldn't be imputed to the North Carolina Department of Transportation. What actions of the state are they not? I suppose technically, but it's a different branch of government. DOT is under the executive branch. They are only authorized to do what the legislature authorizes them to do. They don't make the laws. I don't believe that the actions of the legislature shouldn't be imputed to DOT, and it's ultimately the action of the MPO that makes this matter moot today. They did so by removing the project from their metropolitan... Right, but those are two separate questions. Whether it's moot and whether we vacate the district court's opinion, isn't it? If we agree with you it's moot, we still have to agree whether to vacate the district court's opinion. That's correct. So if you could keep those separate in your argument, that would be good. And I would argue that happenstance is because of the actions of the MPO. The MPO took it out of their MTIP. By federal regulations, the transportation plan that the DOT does approve is called the STIP, but it incorporates the MTIP without change into the STIP. So DOT doesn't have discretion to put in or take out this project. That's the decision of the MPO. It has to approve that process without change. So the fact that the MPO took it out of their plan takes it out of the state plan, and without the project being in either of those documents, there is no federal authority to move forward with this project. It is no longer a federal action. You might want to consider moving on to your argument on the merits beyond the argument of moot. Upon the decision of the merits, we believe that the district court invalidated an established methodology of starting with the MPO data and using a gravity model to quantify possible induced growth. The MPOs are the experts in local transportation planning. They're the experts who project future scenarios. They look out 20 years into the future, try to project socioeconomic conditions and so forth, and then plan transportation projects to meet those needs. So they are federally mandated to use current assumptions, current projections, in creating transportation plans. NEPA, what the agencies did in this case, feeds off of that process. They feed off of the work that the MPO does, and that's what happened in this case. So the MPO data was determined to represent a build scenario. The agencies went to the MPO, the local experts who created this data. It was determined from the local experts that it is a build scenario. The DOT asked those same local experts who created this data, is it reasonable to use a gravity model to remove the influence of the project to determine a no-build scenario? And these local experts all agreed that, yes, it was reasonable to use a gravity model. So what better validation is there to ask the local experts who create the data whether or not it's reasonable to use a gravity model to manipulate their data to remove the project to come up with a no-build scenario? So to be clear, in the indirect and cumulative study, the agencies came up with two sets of socioeconomic data. They had a build, which they started with, and they determined a no-build scenario. The comparison was only within the ICE study area only. And so it was not within the region. And I think that's kind of the fundamental flaw in the district court's reasoning. The district court focused on the region, the geographical area of the region, where, in fact, the ICE study area only included 6% of that region. It was determined that way because that was the area that the project would increase accessibility. And so that was the area where this project could induce growth. Doesn't it seem, though, somewhat counterintuitive to assume that growth in a local area wouldn't necessarily affect growth within a region? What would be the state's interest in spending a billion dollars for a highway project that would only affect the local population exclusive of the Charlotte region? Well, the purpose of the project is to increase connectivity between Gaston County and Mecklenburg County. So it wasn't to – it was not for economic growth.  In the region, it was to provide a connectivity within those two counties. And so the project – the agencies looked at, well, how does a project influence growth? Well, it makes it easier to travel from point A to point B. It doesn't change zoning. It doesn't change schools. It doesn't change whether land is cheaper. It doesn't change that you might be able to be close to Lake Wylie. It creates a better accessibility. And so looking at that factor, that is how the agencies determined or tried to calculate how much additional growth would be in this localized area. How did the gravity model remove the influence of the connector? They started with the build, and so the gravity model is a series of mathematical formulas, and they determined accessibility, and they put that into a formula and determined that based on travel time savings and looking at the areas that the project would provide travel time savings, that would be the ICE study area. And so it was able to quantify, I guess, the accessibility and able to use that quantification and remove the influence of the project by removing the socioeconomic projections. So if you're looking at households to begin with, they did the formula, came up with a way to quantify and basically remove people from the project or remove people from the study area because the influence of the project was no longer there. And in doing so, then they compared... The gravity model started with the assumption, though, that the connector would be built, right? That's correct. They started with the build assumption because that is the data that they had that existed, and they used the gravity model to remove the influence of the project from that build assumption. How can you remove the influence? I mean, that sounds like a jargon to me, if you forgive my saying so. Sure. When you assume the build model, how do you remove its influence? By using the gravity model, which focuses on accessibility and quantifying. I think what you're saying is the gravity model redistributes growth, aren't you? It ultimately... It removes the influence of the build. It removes the influence of the project from the ICE study area, and then it creates two sets of socioeconomic data that can be compared with the original build scenario, and that's how they quantify the 2.9% induced growth. How in the world would you start with the build and then have to work to remove its influence? I mean, to me that just seems so illogical. It's counterintuitive, but it goes to the heart of this case. The federal regulations say start, use the MPO data, and that's what the MPO data showed. When the MPO local experts projected 20 years in the future, they expected or planned that this project would influence their growth. So that was the data that the agencies had to start with. And then they used the gravity model to try to take out the influence of the project to come up with a no-build. But the gravity model focused on accessibility and travel time savings. As I understand it, you used the same socioeconomic data in both the build and the no-build options. And is that what's reflected in what is called the MRM, the Metrolina Regional Travel Demand Model? The Travel Demand Model is a, I guess think of it as the tool that was able to generate traffic forecasts. Travel time savings is a component, is a factor in that tool. Travel time savings along with lots of other factors come out to help generate traffic forecasts. So they took a piece of the model because that data existed there in the model, and they were able to use the travel time savings to determine what area will this project help influence growth. Well, it will influence growth in areas where you will save time traveling from Gaston County to Mecklenburg County. It won't save time 20 miles away in Stanley County or whatever because it doesn't help with accessibility in that area. I see my time is up. Well, you've reserved some time for a bonus. Thank you. Thank you. Ms. Hunter? Thank you, Your Honor. Ms. Hunter representing Clean Air Carolina and the Catawba Riverkeeper Foundation. There are an inordinate number of acronyms in this case. Yes, there are, Your Honor. Transportation acronyms and environmental law acronyms. It's very confusing. I'd like to take a little step back and note that this case is about the NEPA review of one of the most controversial and most environmentally destructive transportation projects ever to be conceived in North Carolina. The district court twice has held that that analysis was illegal, and the federal defendants in this case have abandoned their defense of that project. Well, let's start with why it isn't moot in your view. Yes, Your Honor. As I believe Mr. Slessa admitted, the EIS would still be valid in the future, and this case is a very political one. The road is a very political one. The funding has gone up and down over the years. Don't you say the EIS would still be valid? What do you mean by that? Valid in the face of the district court's decisions that's otherwise? If this court were to vacate the district court's opinion, and the EIS would go out in the world as the baseline NEPA document, defendants then would have to do a reevaluation, which is not a public process. It's an internal process, and determine what changes have there been since that last NEPA document were published. They would then decide, have there been sufficient changes so that we need to publish a supplemental EIS? That supplemental EIS would focus on those changes, and if my clients, for example, wanted to challenge that supplemental EIS, it would be limited to only the changes that had occurred since the last NEPA document and the new NEPA document. Why is that? That's established case law in the way that NEPA works. Well, but I suppose we could fashion an order in this case that would not so limit your ability to challenge, right? I don't believe so, Your Honor. The statute of limitations has been very much narrowed over the past five years by the United States Congress to 150 days, such that there is only 150 days to challenge that initial NEPA document, and I don't know that there would be any ability for our clients to challenge that initial analysis and not the change in the supplemental EIS other than right now. I actually did have kind of a related question. Could we condition vacature on rescission of the EIS, and then you would be able to challenge the failure to comply with the condition of vacature? I believe that could be possible, Your Honor. Certainly vacating this EIS is what we've been asking for. For the agencies to vacate the EIS is what we've been asking for for many years. It was because the writing was on the wall that this defunding was going to happen, and I would just point to Joint Appendix page 309, which is where the state defendants briefed the issue of ripeness before the district court and took an entirely contrary position to what they're taking today, saying that under NEPA, the issuance of a rod is not contingent upon available funds and that NEPA does not require a project to be constructed within a certain period of time. So certainly before the district court and until they lost, the defendants in this case have been saying that this NEPA litigation and NEPA process is entirely separate from the political funding process that comes next. It necessarily comes next because NEPA is a democratic decision-making tool that informs that process. I'll move on to the merits unless you have further questions on mootness. If you could tell us what's your objection to this case being determined as moot but the trial court's order remain in place? How do you lose under that scenario? Certainly that would solve many of the harms of my clients in this case if the EIS was no longer valid. In what manner are you compromised by that outcome? I don't believe my clients would be compromised. I do think it would be setting a tricky precedent under NEPA if a case could be mooted out because of funding concerns. Because there is that very narrow statute of limitations, I think it would allow Departments of Transportation to let that clock run out before the project was funded and claim mootness or ripeness up until the time. That's not a problem with your client, right? No, Your Honor. I believe that so long as this record of decision is no longer legally valid, that's all that my clients have been fighting for for four years. Turning to the merits, this case is really about baselines and is very similar to the 2012 cases this court decided, North Carolina Wildlife Federation and Back Bay. Defendants set out these arbitrary baselines in two different parts of their analysis. The very first place they started with was the traffic forecast. For the traffic forecast, the very first thing they did was use identical forecasts of socioeconomic growth to create both a billed traffic forecast and that no-billed baseline traffic forecast that everything is compared with. Defendants admit in the record that that no-billed traffic forecast was based on data that assumed that this road would be built. From the very outset of this NEPA process, you have a completely arbitrary baseline, just as you did in the North Carolina Wildlife Federation case. It's not surprising that the cases are so similar. Both of those roads were being analyzed by the exact same people at the exact same time under the North Carolina Turnpike Authority. The other side, though, says that the reason they did that is they made a reasoned determination that the difference in impact and traffic forecast were not significant enough to warrant this making a distinction. What's wrong with that? Well, Your Honor, certainly at that time, when they first put out those traffic forecasts, this first starting point in 2007, no reasoned determination had been made. There's nothing to point to in the record that it had been. I believe when defendants make that point, they say that after they had been through all this other analysis in the gravity model, which I can talk about in more depth in a minute, then in 2010, they went back and sort of in a post hoc way said, that was fine what we did at the start of the process. The reason they make that assessment is that through their gravity model, they found very little difference between a build and a no build projections. And so they said, well, it was okay to base our traffic forecasts on the same data. But that assumes that the gravity model was correct. And it also overlooks a really important part. You say it assumes it's correct. What do you mean by that? It assumes that that gravity model process was properly done. You don't have any objection to the model in the abstract. You're objecting to its application. You're saying that they did it wrong? No, Your Honor. I was answering your question about traffic forecasts. And they used their separate analysis of the gravity model to justify their traffic forecasts. And we believe that gravity model process was also separately incorrect. But the traffic forecast, as I understand it, the traffic forecasts were based on socioeconomic data and then road networks based on the socioeconomic data. Okay. So the way that traffic forecasting works is you first got to look, where do people live? Where do people work? Where are they going to be driving to? That's your socioeconomic data. That remained the exact same. And that was going to be my point. It was the, as I understand it, the road networks were overlaid on the same economic data which went into the no-build baseline and the build alternative. That's right, Your Honor. And the problem with that is it's not just the level of growth, it's the distribution of where people are living. All of that underlying data was based on this assumption that the road would be built. And I believe the consultant who made that data thought that it would affect growth somewhere around 15%. And so you've got all this growth that's come from the road being built, and then the only thing you do for the no-build forecast is take out the road, and suddenly you've got all these cars having to fit on existing highways. And so, of course, congestion suddenly looks a lot more serious than if you'd created a no-build scenario that actually didn't include that road's influence. And this is a type of era, legal era, that a number of district courts have found throughout the country that departments of transportation have used to justify construction of major highways like this one. But moving to the gravity model, again, as I believe you noted with Ms. DeSlessa, the starting point there, again, was that the road would be built. So you've got all this growth from the road in your build scenario. For the no-build scenario, all that was done was to move it around a little bit based on accessibility. Ms. DeSlessa mentioned that they removed the influence of the road, but there's no evidence that that was done. All that was done was to remove the influence of accessibility. And Ms. DeSlessa mentioned, well, this road, this billion-dollar highway, was not going to be constructed for economic growth. But that is not what defendants said in their application for federal loan funding. In fact, they explicitly said, we would like the federal government to give us a low-interest loan because we want to build a billion-dollar highway that will bring growth and jobs and economic development to Gaston County. It's the same story that defendants were telling the legislature, we're seeing in press releases, we're working with the local chambers of commerce. And Ms. DeSlessa mentioned, well, we asked these local experts, and they said all this methodology was fine. But again, those local municipalities wanted this road to be constructed because it was going to bring growth and development and jobs to the region. And so it seems arbitrary and capricious to have that assumption that's got absolutely no rational basis that there will be no overall growth and elsewhere be touting this road and wanting to build this road precisely for those growth purposes. Ms. DeSlessa also mentioned that federal regulations say that you are required to use MPO data, and so that's why they started with this bill of data. And it's true that the federal regulations say that you can use MPO data, and that might be a good place to start. But the regulation is also clear that you've got to use it for an appropriate purpose. And federal highways regulations make very clear that the first thing you look at when you get that MPO data is, does this assume that the road is going to be built or not? And if it does, then, you know, do you need to separately forecast how the road will look like, how the area will look like if the road is not going to be built? We gave an escape clause, didn't we, in the North Carolina Federation case, by saying that while ordinarily making the assumptions of building will invalidate a model, there can be cases where the area is so saturated. That's exactly right, Your Honor. How does that play into your analysis here? Yes, Your Honor. So that escape clause was based on the Laguna Highway Ninth Circuit case, and that's a case where 98.5% of the land area had already either been developed or was slated for development. And in that case, the court said, well, it's really not going to matter whether we include the road's influence or not because this area is just fully saturated. Well, Laguna Beach is not Gaston County. Gaston County is a very rural area currently. There is plenty of land to be developed. It's certainly not developed or slated for development. And this road is, as defendants themselves say in the EIS, creating these two major crossings of the Catawba River that would open up all that land for development. So you really couldn't find a more different situation. It's totally different. Exactly, and that's what this court found when it looked at the case in Union County also. It's very similar. I think, you know, sorry. One final point is defendants here have asked for a lot of deference to their methodology, but this court has been very clear in the Audubon case and others that NEPA is a very case-specific inquiry, and defendants here just didn't do their job. What they need to do is look at the facts on the ground. Defendants are trying to rely on kind of this broad idea that no highways ever bring growth to an area, so it's fine for us to assume that in our baseline. But one, there's not record support for that assumption. And two, defendants themselves prioritize roads based on how they are going to bring economic growth to a region. That's a lot of reason why they build roads in the first place. And here you've got a situation where there's a major international airport, a new intermodal terminal, you've got two major new river crossings opening up all these areas of land to development, and for defendants to just rest on a 15-year-old study from New York to say, it's fine, we can just assume this road won't have any influence on growth is the very definition of arbitrary and capricious. So unless you have any other questions, I'll urge you to affirm the ruling of the district court. Thank you very much. There's one of the, I guess, kind of the elephant in the room is why does DOT care about this project? Why does DOT care about the district court's decision? And vacature is important in this case to DOT because it would provide, create an erroneous basis to invalidate future environmental impact statements on future highway projects. It would seem to me that that's a really good argument for why it's not moot. And I believe the plaintiffs have alluded, or they argue in their briefs that it's not moot. And I believe that's ultimately the reason why the plaintiffs want to use this opinion as precedence for future projects. Because in future projects, DOT is going to go to the NPO and see what data they have and try to use that data and make it specific and continue that process with the NEPA process. It's something that happens in North Carolina, happens across the country in federal highway projects. That's just what the regulations say. That's the way that transportation works is it starts with the NPO and it works its way through NEPA and then you get to construction. And so for the agencies not to be able to rely on the NPO's work that they have already done, they're the experts. For DOT to come in and push them aside and say, we're coming from Raleigh, we know what's best for your, we know how your area is going to grow, that's not what the regulations encourage. The other, I think, another red herring in here is focusing on the regional numbers. What happens outside the ICE study area is irrelevant. The numbers could be contained within the region, they could disappear in the thin air. They're not studied, they're not considered. They only compare the difference between the build and no build in the ICE study area only. But can you understand why I have some skepticism that a billion dollar connector, say, between Raleigh and Durham would be looked at just within the local area around the connector and be considered and the determination made that that would have no impact whatsoever on the growth of the RDU region? It simply does not comport with any reality with which I'm familiar. And I certainly understand the common sense argument. And I think this is a dispute that people can debate. Do roads create growth or do roads accommodate growth? Is the Raleigh-Durham area going to grow anyway, and then you're going to have this road that helps the Durham area? Well, that's the point of having – that's the point of doing analyses where you take – where you don't – the analysis regarding the build alternative doesn't creep into the no build alternative. And that's what troubles me might have happened here because the same socioeconomic data appears to underlie the traffic forecast in both the build and no build alternatives. And that's – I understand. And initially because the build socioeconomic data is what the agencies had. That is what is in the travel demand model. So that's what they used initially for traffic forecast. When they completed the ICE study, they had a new set of socioeconomic data that was a no build. So they started with a build. Now they have new information, which is a no build. The agencies took that information, went back to the traffic forecast to say, is this significant? Will these new socioeconomic data change the conclusions and the purpose of the traffic forecast? And they, as experts, determined that it was not. A 2.9% change in socioeconomic data is not going to change the purpose of the traffic forecast. This is still going to be a four-lane road. It's still going to – you know, the footprint is still going to be the same. It's still going to impact the same amount of wetlands, streams, and so forth. And so traffic forecast is a blunt tool, but it's not a finite tool. It's not – small changes in socioeconomic data is not going to make a difference for the purpose of what traffic forecasts are used. Mr. Susser, could I direct you, sir, to page 7 of your reply brief, where you say at the bottom of the page that this court has procedures at its disposal to provide assurance that in the event of vacatur, the groups will not lose any rights they may have to challenge the underlying environmental analysis. And then you pose one core example at the top of page 8. You say this court could vacate and instruct the district court to dismiss without prejudice any attempt to refile or amend in the event the project somehow receives authorization. Well, isn't there a statute of limitations problem with your example? I don't believe so. I believe the statute – Why not? Because they filed within the time, and the court can impose a dismiss without prejudice to reopen that process, give the plaintiffs assurance that they can refile if this existing EIS is used for a decision in the future. I don't believe that such limitations would be implicated. So a dismissal without prejudice would supersede the statute of limitations? I think it would leave the plaintiffs' ability to refile this complaint to challenge this EIS. Do you have any authority for that? The authority, not directly. I guess the authority is just that this court certainly has the ability to require further proceedings as may be just in the circumstances. Also, under Rule 41A of the civil procedures, although it's not directly dealing with voluntary dismissals, district courts can impose restrictions as they deem fit on voluntary dismissals. And so this wouldn't be a voluntary dismissal. I think the same principle applies. The court can apply conditions as it deems fit. I take it you don't like my suggestion about conditioning vacature on rescission of EIS. Not much, huh? The project is dead, so I don't think it really matters. But it seems to matter a great deal to you. It doesn't really matter. You should have just agreed to that. Well, if we could get vacature of the district court's opinion, that is ultimately our goal. Vacature of the district court's opinion. Yes, I understand. Thank you very much. We will ask the court to adjourn court for the day and then come down and greet counsel.
judges: Allyson K. Duncan, Barbara Milano Keenan, Albert Diaz